Rel: August 23, 2024

**Notice:** This opinion is subject to formal revision before publication in the advance sheets of **Southern Reporter**. Readers are requested to notify the **Reporter of Decisions**, Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334) 229-0650), of any typographical or other errors, in order that corrections may be made before the opinion is published in **Southern Reporter**.

# Alabama Court of Criminal Appeals

## OCTOBER TERM, 2023-2024

———————————————

## CR-21-0242

———————————————

## Debra Bracewell

## v.

## State of Alabama

## Appeal from Covington Circuit Court
## (CC-78-26)

COLE, Judge.

Debra Bracewell appeals the circuit court's decision to sentence her to life imprisonment without the possibility of parole following a resentencing hearing pursuant to Miller v. Alabama, 567 U.S. 460 (2012).

## Facts and Procedural History

"Late in the evening on August 14, 1977, Bracewell, who was 17 years old at the time, and her husband Charles Bracewell,[1] who was at least 10 years her senior, entered a gasoline station/convenience store owned and operated by Rex Carnley. Once inside, Charles brandished a gun and demanded money from Carnley, and Bracewell, at Charles's direction, walked behind the checkout counter and retrieved a pistol Carnley kept in a drawer under the cash register. Bracewell then stood on the rungs of a stool behind the counter and shot Carnley in the back of the head from approximately 18 inches away. Charles took the pistol from Bracewell, and Bracewell left the store. Charles then shot Carnley seven more times and took over $ 1,000 in cash from Carnley's person. Bracewell subsequently confessed to the murder, was convicted of murder made capital because it was committed during the course of a robbery, and was sentenced to life imprisonment without the possibility of parole.[2]

"_____

"[1]There is some dispute in the record as to whether Bracewell and Charles were, in fact, legally married.

"[2]Bracewell was originally convicted of capital murder in 1978 and was sentenced to death. That conviction and sentence were ultimately reversed on the authority of <u>Beck v. Alabama</u>, 447 U.S. 625, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980), and <u>Beck v. State</u>, 396 So. 2d 645 (Ala. 1980). <u>See Bracewell v. State</u>, 401 So. 2d 119 (Ala. Crim. App. 1978), rev'd, 401 So. 2d 123 (Ala. 1979), on remand to, 401 So. 2d 124 (Ala. Crim. App. 1980), judgment vacated by <u>Bracewell v. Alabama</u>, 449 U.S. 915, 101 S. Ct. 312, 66 L. Ed. 2d 143 (1980), on remand to, 401 So. 2d 130 (Ala. Crim. App. 1981). Bracewell was again convicted of capital murder on retrial in 1981 and was sentenced to life imprisonment without the possibility of parole."

Bracewell v. State ("Bracewell I"), 329 So. 3d 29, 31 (Ala. Crim. App. 2019) (opinion on original submission).

Over 30 years after Bracewell began serving her sentence of life imprisonment without the possibility of parole, the Supreme Court of the United States decided Miller, which held that the Eighth Amendment to the United States Constitution "forbids a sentencing scheme that mandates life in prison without the possibility of parole for juvenile offenders." Miller, 567 U.S. at 479, 132 S. Ct. 2455. In Miller's wake, the Alabama Supreme Court and the Alabama Legislature developed standards for sentencing a juvenile for a capital offense:

> "In striking down mandatory sentences of life in prison without the possibility of parole for juveniles who commit capital murder, the Court did not hold that juveniles are categorically exempt from such a sentence. Miller, 567 U.S. at 479, 132 S. Ct. 2455. 'Although Miller did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect "'irreparable corruption.'"' Montgomery [v. Louisiana], 577 U.S. [190, 195], 136 S. Ct. [718, 726 (2016)] (quoting Miller, 567 U.S. at 479-80, 132 S. Ct. 2455, quoting in turn, Roper v. Simmons, 543 U.S. 551, 573, 125 S. Ct. 1183, 161 L. Ed. 2d 1 (2005)). Thus, 'Miller "mandates ... that a sentencer follow a certain process -- considering an offender's youth and attendant characteristics" -- before "meting out" a sentence of life imprisonment without parole.' Click[v. State], 215 So. 3d

3

[1189,] 1192 [(Ala. Crim. App. 2016)] (quoting Miller, 567 U.S. at 483, 132 S. Ct. 2455). '"[A] judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles."' Click, 215 So. 3d at 1192 (quoting Miller, 567 U.S. at 483, 132 S. Ct. 2455). Consequently, '[a] hearing where "youth and its attendant characteristics" are considered as sentencing factors is necessary to separate those juveniles who may be sentenced to life without parole from those who may not.' Montgomery, 577 U.S. at 210, 136 S. Ct. at 735 (quoting Miller, 567 U.S. at 465, 132 S. Ct. 2455). The Court explained that '[t]he hearing ... gives effect to Miller's substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity.' Montgomery, 577 U.S. at 210, 136 S. Ct. at 735.

"When Miller was decided, Alabama's capital-murder statute provided for two possible sentences -- life in prison without the possibility of parole or death. See § 13A-5-39(1), Ala. Code 1975. Juveniles, however, were not eligible for a sentence of death; therefore, the only sentence available for a juvenile convicted of capital murder was life in prison without the possibility of parole. See Ex parte Henderson, 144 So. 3d [1262, 1266-84 (Ala. 2013)]; Miller v. State, 148 So. 3d 78 (Ala. Crim. App. 2013). In the wake of Miller, both the Alabama Supreme Court and the Alabama Legislature acted to amend our capital-murder statutes so as to provide juveniles with individualized sentencing and an opportunity to have a sentence imposed that includes the possibility of parole.

"First, in Ex parte Henderson, our Supreme Court was asked to order the dismissal of capital-murder indictments against two juveniles because Alabama law at the time mandated a sentence of life in prison without the possibility of parole. Ex parte Henderson, 144 So. 3d at 1262-84. The Alabama Supreme Court recognized that the Miller decision 'was not a categorical prohibition of a sentence of life imprisonment without parole for juveniles, but rather

required the sentencer to consider the juvenile's age and age-related characteristics before imposing such a sentence.' Ex parte Henderson, 144 So. 3d at 1280. 'Miller mandates individualized sentencing for juveniles charged with capital murder rather than a "one size fits all" imposition of a sentence of life imprisonment without the possibility of parole.' Ex parte Henderson, 144 So. 3d at 1280. However, the Henderson Court 'recognize[d] that a capital offense was defined under our statutory scheme as one punishable by the two harshest criminal sentences available: death and life imprisonment without the possibility of parole.' Ex parte Henderson, 144 So. 3d at 1280. To ameliorate the unconstitutional portion of Alabama's capital sentencing scheme as it applied to juveniles, the Alabama Supreme Court '[s]ever[ed] the mandatory nature of a life-without-parole sentence for a juvenile to provide for the ... possibility of parole.' Ex parte Henderson, 144 So. 3d at 1281.

"After severing from the statute the mandatory nature of a sentence of life in prison without parole for juveniles convicted of capital offenses, the Alabama Supreme Court established factors courts must consider when deciding whether life in prison with the possibility of parole would be an appropriate sentence for a juvenile. Id. at 1283-84. Specifically, the Court held

"'that a sentencing hearing for a juvenile convicted of a capital offense must now include consideration of: (1) the juvenile's chronological age at the time of the offense and the hallmark features of youth, such as immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile's diminished culpability; (3) the circumstances of the offense; (4) the extent of the juvenile's participation in the crime; (5) the juvenile's family, home, and neighborhood environment; (6) the juvenile's emotional maturity and development; (7) whether familial and/or peer

5

pressure affected the juvenile; (8) the juvenile's past exposure to violence; (9) the juvenile's drug and alcohol history; (10) the juvenile's ability to deal with the police; (11) the juvenile's capacity to assist his or her attorney; (12) the juvenile's mental-health history; (13) the juvenile's potential for rehabilitation; and (14) any other relevant factor related to the juvenile's youth.'

"Ex parte Henderson, 144 So. 3d at 1284. See also Foye v. State, 153 So. 3d 854, 864 (Ala. Crim. App. 2013). The Court 'recognize[d] that some of the factors may not apply to a particular juvenile's case and that some of the factors may overlap.' Ex parte Henderson, 144 So. 3d at 1284.

"After the Alabama Supreme Court decided Ex parte Henderson, the Alabama Legislature amended our capital-sentencing statutes to comply with the guidelines of Miller. First, the Legislature amended § 13A-5-2(b) to provide that '[e]very person convicted of murder shall be sentenced by the court to imprisonment for a term, or to death, life imprisonment without parole, or life imprisonment in the case of a defendant who establishes that he or she was under the age of 18 years at the time of the offense, as authorized by subsection (c) of Section 13A-6-2.' The Legislature redefined a capital offense as, '[a]n offense for which a defendant shall be punished by a sentence of death or life imprisonment without parole, or in the case of a defendant who establishes that he or she was under the age of 18 years at the time of the capital offense, life imprisonment, or life imprisonment without parole, according to the provisions of this article.' § 13A-5-39(1), Ala. Code 1975. The Legislature also provided:

"'If the defendant is found guilty of a capital offense or offenses with which he or she is charged and the defendant establishes to the court by a preponderance of the evidence that he or she was under the age of 18 years at the time of the capital

6

offense or offenses, the sentence shall be either life without the possibility of parole or, in the alternative, life, and the sentence shall be determined by the procedures set forth in the Alabama Rules of Criminal Procedure for judicially imposing sentences within the range set by statute without a jury, rather than as provided in Sections 13A-5-45 to 13A-5-53, inclusive. The judge shall consider all relevant mitigating circumstances.'

"§ 13A-5-43(e), Ala. Code 1975. The Legislature further established that, '[i]f [a juvenile] defendant is sentenced to life [imprisonment with the possibility of parole] on a capital offense, th[at] defendant must serve a minimum of 30 years, day for day, prior to first consideration of parole.' Id.

Betton v. State, 292 So. 3d 398, 403-05 (Ala. Crim. App. 2018).

Within a year of the Miller decision, Bracewell filed a petition seeking postconviction relief pursuant to Rule 32, Ala. R. Crim. P., alleging that her sentence was unconstitutional. At that time, courts were divided on the question whether Miller applied retroactively to cases on collateral review. See Williams v. State, 183 So. 3d 198, 206-11 (Ala. Crim. App. 2014) (examining the split among courts on the question whether Miller applied retroactively on collateral review). In 2016, in Montgomery v. Louisiana, 577 U.S. 190, 208 (2016), the Supreme Court settled that question and held that the rule announced in Miller applied retroactively on collateral review.

After Montgomery, the Covington Circuit Court granted Bracewell's petition, set aside her sentence of life imprisonment without the possibility of parole, and set her case for a Miller resentencing hearing. The circuit court held Bracewell's Miller resentencing hearing in August 2017. At the hearing,

"the State presented testimony from Marie Miller, who was the wife of the victim, Rex Carnley, at the time of his death, about the emotional and financial impact Carnley's murder had on her and her 3 sons, who were 18, 16, and 13 years old at the time of the murder. In addition, the State presented testimony from Nickey Carnley, Carnley's oldest son, and Kelley Carnley, Carnley's youngest son, about the impact their father's death had on them and on their brother Murray Carnley. The State introduced into evidence a transcript of the guilt phase of Bracewell's 1981 trial; a copy of Bracewell's January 23, 1978, statement to police; and a copy of the autopsy report. The State also introduced into evidence a copy of a letter Bracewell wrote in connection with a 2011 postconviction proceeding in which she claimed that Charles Bracewell was the shooter and that she was innocent, as well as a copy of a notarized letter from Charles proclaiming Bracewell's innocence; a letter Bracewell wrote to the Covington County District Attorney in 2008 claiming that the United States Supreme Court had reversed her 1978 conviction based on insufficient evidence and that she should not have been retried for capital murder in 1981, and also claiming that it was Carnley's wife, Marie, who had killed Carnley; and a copy of a 1989 letter addressed to then governor Guy Hunt and purporting to be from Marie (the letter was signed 'Mrs. Carnley'), in which Marie allegedly confessed to killing her husband and stated that Bracewell was innocent -- a letter Marie Miller testified she did not write. In addition, the State introduced into evidence records

8

from the Alabama Department of Corrections ('DOC') reflecting that Bracewell had multiple disciplinary citations in prison in the 1980s, including one in 1989 for attempting to escape, and records from the Elmore Circuit Court indicating that Bracewell had pleaded guilty to first-degree escape in 1990.[3]  Finally, the State introduced into evidence a 'Psychological Interview/Data Entry Form' from the DOC indicating that, in 1986, Bracewell had a full-scale IQ score of 74 and suffered from no significant emotional problems or substance-abuse problems. (C. 1284.)[4]

"Bracewell presented documentary and testimonial evidence about her childhood and adolescent years and about her life in prison over the last 40 years.  Bracewell grew up in poverty and suffered both physical and sexual abuse at the hands of her father, Owen Fillman ('Owen'), throughout her childhood and adolescent years.  As the trial court noted in its sentencing order: 'By all accounts, [Bracewell] grew up in the worst situation imaginable.'  (C. 218.)  Bracewell's older brother Jimmy Fillman, older sister Peggy Jones, and paternal cousin Nancy Daniel testified about the abuse.  Their testimony indicated that Owen rarely worked and that the family was 'dirt poor,' many times having little or no food to eat. (R. 92.)  Owen abused Bracewell's mother and forced her to prostitute herself to earn money for groceries, which resulted in a half sister that Owen forced Bracewell's mother to put up for adoption when she was born.

"Owen physically abused all of his children, including Bracewell, often beating them with a belt.  When Bracewell was six or seven years old, Owen kicked her and pushed her into a fire, which resulted in severe burns on Bracewell's hands and buttocks, and when Bracewell was about eight years old, Owen threw Bracewell against a wall so hard that she broke her sternum.  Bracewell never received medical treatment for her injuries.  Owen also repeatedly sexually abused Bracewell, her sisters, and Daniel.  The abuse began when Bracewell was 'five, six, or seven,' and when Bracewell

9

attempted to resist, Owen severely beat her. (R. 100.) At one point, when Bracewell was 13 or 14 years old, Bracewell reported the sexual abuse to police and an arrest warrant was issued for Owen; when Owen learned of the warrant, he shot himself in an attempt to avoid going to jail.[5] Owen forced Bracewell to quit school in the seventh grade in order to babysit her younger siblings and to allow more time for him to abuse her.[6] Owen was described as 'a monster.' (R. 217.)

"Bracewell 'was a little bit on the slower side,' had a speech impediment, and had been in special-education classes when she was in school, but was literate. (R. 105.) Fillman described Bracewell as 'nice,' 'polite,' and 'very friendly,' but 'a little on the shy side.' (R. 105.) He also said that, at 17 years old, Bracewell had the maturity level of a 15-year-old. Daniel said that Bracewell was 'troubled,' 'withdrawn,' 'timid,' 'shy,' and 'easily controlled by others' as a result of the abuse she suffered. (R. 220.) A few months before the murder, Bracewell met Charles Bracewell, who was 10 to 12 years her senior and had been in and out of prison, and Charles provided Bracewell an avenue to escape Owen's abuse. Bracewell's mother did not want Bracewell seeing Charles, but Bracewell would sneak out of the house to meet him. Fillman said that Charles 'had quite a bit of control over' Bracewell because Bracewell was desperate to escape her father's abuse and 'didn't know any better.' (R. 114.) Jones also described Charles as 'controlling.' (R. 233.) She testified that the one time she met Charles at her house, she cautioned Bracewell against staying with Charles and asked Bracewell not to leave with him, to which Bracewell responded, 'I got to.' (R. 233.) Charles apparently overheard their conversation, and when he and Bracewell got close to their vehicle to leave, he hit Bracewell in the face.

"Bracewell also presented evidence indicating that she was intellectually disabled, having a full-scale IQ score of 62 when she was 15 years old and a full-scale IQ score of 67 when she was evaluated in 2017, at the age of 57, by Dr. John Goff,

10

a clinical neuropsychologist. According to Dr. Goff, Bracewell could read only at a third-grade level, 'which is just below a level required for functional literacy' (C. 1328); 'her mathematical skills are rather extraordinarily limited' (C. 1329); and she suffered from 'adaptive skills deficits.' (C. 1329.) Dr. Goff also indicated that Bracewell's school records reflected that her performance on 'the IQ test from the California Test of Mental Maturity' was '"too low to score."' (C. 1325.) Bracewell also suffered from a mild speech defect that Dr. Goff believed was likely more severe when she was younger. Dr. Goff described Bracewell as being in the mild range of intellectual disability.

"Dr. Goff testified that Bracewell was consistently described in her school records as immature and that all the records he reviewed regarding Bracewell 'were reflective of considerably great immaturity.' (R. 146.) Dr. Goff indicated that adolescents are generally immature, lack impulse control, have an inability to plan, are vulnerable to peer pressure, and have difficulty making rational decisions and that those traits were 'magnified' in Bracewell because of her intellectual disability. (R. 145.) He indicated that individuals with intellectual disability like Bracewell are gullible and naive, have a '"tendency to give in when under pressure,"' and have a desire to please others in order to be accepted. (C. 1329.) Dr. Goff opined that Bracewell's intellectual disability and her history of physical and sexual abuse made her even more vulnerable than the average adolescent to the influence of others at the time of the crime. Dr. Goff also stated that Bracewell's adolescence, intellectual disability, and history of physical and sexual abuse likely would have made it 'difficult' for her to deal with police and to assist her counsel at trial. (R. 154.) Further, Dr. Goff said that, although he did not perform any formal testing, at the time he interviewed her Bracewell appeared to be suffering from anxiety and possibly post-traumatic stress disorder as a result of the repeated physical and sexual abuse in her childhood and adolescence.

11

"Finally, Bracewell presented evidence indicating that she had positive inmate evaluations and progress reviews during her time in prison, particularly since the 1990s; that she had completed well over a dozen self-improvement, educational, and religious programs offered by the prison; that she was housed in the honor dorm; and that she had been, for several years, heavily involved in the prison ministry, assisting the chaplain with baptisms and ministering to other inmates, particularly new inmates.

"_____

"[3]The record indicates two separate incidents involving Bracewell's escaping or attempting to escape from prison. A disciplinary report introduced into evidence by the State indicates that Bracewell attempted to escape in May 1989 by climbing to the top of the fence surrounding the prison and then climbing back down. (C. 1243.) A disciplinary report introduced into evidence by Bracewell indicates that she successfully escaped in February 1990 by climbing over the fence surrounding the prison and was recaptured later by local law enforcement. (C. 1375-76.)

"[4]We note that the State declined to make a sentencing recommendation at the resentencing hearing, arguing that 'it [wa]s up to the Court to decide' what sentence was appropriate for Bracewell. (R. 6.) However, at a pretrial hearing, the State took the position 'that this defendant does not reach the level of those rare juveniles who would get life without.' (R. 350.)

"[5]It appears that no action was taken on the complaint Bracewell filed.

"[6]Other evidence indicated that Bracewell subsequently returned to school briefly and dropped out again in the ninth grade."

Bracewell v. State ("Bracewell II"), 329 So. 3d 29, 40-42 (Ala. Crim. App. 2020) (opinion on return to remand). At the close of her Miller resentencing hearing, the circuit court sentenced Bracewell to life imprisonment without the possibility of parole. On September 29, 2017, the circuit court issued a written order memorializing its decision.

In its written order, the circuit court "set out the law under Miller, supra, and the Alabama Supreme Court's subsequent opinion in Ex parte Henderson, 144 So. 3d 1262 (Ala. 2013)," "listed each of the Ex parte Henderson factors and recited the evidence presented at the hearing that it believed was relevant to each factor," and, "out of '[a]n abundance of caution,' ... conducted an analysis pursuant to § 13A-5-47(b), Ala. Code 1975, which is part of Alabama's adult capital-sentencing scheme." Bracewell I, 329 So. 3d at 33. In conducting its adult-capital-sentencing analysis, the circuit court found the existence of three aggravating circumstances, two statutory mitigating circumstances, and three nonstatutory mitigating circumstances. Bracewell appealed the circuit court's judgment to this Court.

On original submission in that appeal, this Court remanded Bracewell's case to the circuit court "to clarify whether its decision to

13

sentence Bracewell to life imprisonment without the possibility of parole was based on its consideration of the factors in Ex parte Henderson or on its finding that the aggravating circumstances it found to exist under § 13A-5-49 outweighed the mitigating circumstances it found to exist under §§ 13A-5-51 and 13A-5-52." Bracewell I, 329 So. 3d at 36.

On remand, the circuit court issued an order explaining that its adult-capital-sentencing analysis "was done in the alternative should a later court determine the sentencing scheme employed by Henderson was incorrect," and that its "decision to sentence [Bracewell] to life in prison without the possibility of parole was based on [its] consideration of the factors in Ex parte Henderson and following the procedure contained within Ala. R. Crim. P. 26.6." (Record on Return to Remand in CR-17-0014, C. 2.)

On return to remand, Bracewell argued, in part, that this Court should reverse the circuit court's sentencing order because it had "erroneously used her age as a fact in aggravation supporting a sentence of life imprisonment without the possibility of parole instead of a fact in mitigation supporting parole eligibility and, in doing so, ignored the hallmark features of youth." Bracewell II, 329 So. 3d at 44. This Court

14

agreed with Bracewell, reversed the circuit court's judgment, and remanded Bracewell's case to the circuit court for that court "to set aside the sentence and reconsider the Ex parte Henderson factors and resentence Bracewell in light of this [Court's] opinion." Bracewell II, 329 So. 3d at 46.

After this Court reversed the circuit court's judgment and remanded Bracewell's case to that court, the Supreme Court of the United States decided Jones v. Mississippi, 593 U.S. 98, 141 S. Ct. 1307, 209 L. Ed. 2d 390 (2021), in which it "clarified its holdings in Miller and Montgomery." Wynn v. State, 354 So. 3d 1007, 1020 (Ala. Crim. App. 2021).

In Jones,

"Brett Jones was convicted of murdering his grandfather, and he had received a mandatory sentence of life imprisonment without the possibility of parole. He was 15 years old at the time of the crime. After Jones received postconviction relief from his mandatory sentence, a new sentencing hearing was held at which the trial court considered Jones's youth and had discretion in selecting the appropriate sentence, and the trial court again sentenced Jones to life imprisonment without the possibility of parole. Jones argued on appeal 'that a sentencer's discretion to impose a sentence less than life without parole does not alone satisfy Miller' because to give effect to the holding in Montgomery that Miller substantively limited sentences of life imprisonment without the possibility of parole for juvenile offenders, a sentencer must make a

15

finding, either explicitly or implicitly, that a juvenile is permanently incorrigible. The United States Supreme Court rejected Jones's argument that a finding of permanent incorrigibility is constitutionally required, instead holding that, '[i]n a case involving an individual who was under 18 when he or she committed a homicide, a State's discretionary sentencing system is both constitutionally necessary and constitutionally sufficient.' 593 U.S. at 105, 141 S. Ct. at 1313 (emphasis added).

> "'Under our precedents, this Court's more limited role is to safeguard the limits imposed by the Cruel and Unusual Punishments Clause of the Eighth Amendment. The Court's precedents require a discretionary sentencing procedure in a case of this kind. The resentencing in Jones's case complied with those precedents because the sentence was not mandatory and the trial judge had discretion to impose a lesser punishment in light of Jones's youth.'

"Jones[ v. Mississippi], 593 U.S. at 120, 141 S. Ct. at 1322 (emphasis added).

"The Court noted that both Miller and Montgomery 'squarely rejected' the idea that a factual finding of permanent incorrigibility was required. 593 U.S. at 106, 141 S. Ct. at 1314. The Court then explained its holdings in Miller and Montgomery:

> "Miller repeatedly described youth as a sentencing factor akin to a mitigating circumstance. And Miller in turn required a sentencing procedure similar to the procedure that this Court has required for the individualized consideration of mitigating circumstances in capital cases such as Woodson v. North Carolina, 428 U. S. 280, 303-305 [96 S. Ct. 2978, 49 L. Ed. 2d

16

944] (1976) (plurality opinion), Lockett v. Ohio, 438 U. S. 586, 597-609 [98 S. Ct. 2954, 57 L. Ed. 2d 973] (1978) (plurality opinion), and Eddings v. Oklahoma, 455 U. S. 104, 113-115 [102 S. Ct. 869, 71 L. Ed. 2d 1] (1982). Those capital cases require sentencers to consider relevant mitigating circumstances when deciding whether to impose the death penalty. And those cases afford sentencers wide discretion in determining "the weight to be given relevant mitigating evidence." Id., at 114-115 [102 S. Ct. 869]. But those cases do not require the sentencer to make any particular factual finding regarding those mitigating circumstances.

"'... [T]he Miller Court mandated "only that a sentencer follow a certain process -- considering an offender's youth and attendant characteristics -- before imposing" a life-without-parole sentence. Id., at 483 [132 S. Ct. 2455]. In that process, the sentencer will consider the murderer's "diminished culpability and heightened capacity for change." Id., at 479 [132 S. Ct. 2455]. That sentencing procedure ensures that the sentencer affords individualized "consideration" to, among other things, the defendant's "chronological age and its hallmark features." Id., at 477 [132 S. Ct. 2455].

"'....

"'In short, Miller followed the Court's many death penalty cases and required that a sentencer consider youth as a mitigating factor when deciding whether to impose a life-without-parole sentence. Miller did not require the sentencer to make a separate finding of permanent incorrigibility before imposing such a sentence.

17

And <u>Montgomery</u> did not purport to add to <u>Miller</u>'s requirements.

"'....

"'The key assumption of both <u>Miller</u> and <u>Montgomery</u> was that discretionary sentencing allows the sentencer to consider the defendant's youth, and thereby helps ensure that life-without-parole sentences are imposed only in cases where that sentence is appropriate in light of the defendant's age. If the <u>Miller</u> or <u>Montgomery</u> Court wanted to require sentencers to also make a factual finding of permanent incorrigibility, the Court easily could have said so -- and surely would have said so. ...'

"593 U.S. at 108-11, 141 S. Ct. at 1315-18."

<u>Wynn</u>, 354 So. 3d at 1020-21.

On April 9, 2021, the circuit court held a hearing to determine what needed to be done in Bracewell's case to satisfy this Court's judgment in <u>Bracewell II</u>. At that hearing, the parties agreed that there was no need to present any more evidence to the circuit court. (R. 6-8.) The circuit court then informed the parties that it would review everything presented at Bracewell's <u>Miller</u> hearing in 2017, and it informed the parties that it would consider all objections raised at the 2017 hearing as having been "renewed." (R. 8, 10-11.)

Thereafter, on January 5, 2022, the circuit court sentenced Bracewell in open court to life imprisonment without the possibility of parole. (R. 18.) The court memorialized its decision in a detailed 15-page order, in which it made findings of fact and examined each of the Ex parte Henderson factors. (C. 76-90.) Thereafter, Bracewell moved the circuit court for a "new trial" (C. 92-110), which the circuit court denied (C. 136). This appeal follows.

## Standard of Review

As explained above, even after Miller,

"the sentencing range for a juvenile convicted of capital murder includes life imprisonment without the possibility of parole.

"It is well settled that

"'"[w]here a trial judge imposes a sentence within the statutory range, this Court will not disturb that sentence on appeal absent a showing of an abuse of the trial judge's discretion." Alderman v. State, 615 So. 2d 640, 649 (Ala. Crim. App. 1992). "The exception to this general rule is that 'the appellate courts may review a sentence, which, although within the prescribed limitations, is so disproportionate to the offense charged that it constitutes a violation of a defendant's Eighth Amendment rights.'" Brown [v. State, 611 So. 2d 1194,] 1197, n.6 [(Ala. Crim. App. 1992)], quoting Ex parte Maddox, 502 So. 2d 786, 789 (Ala. 1986).'

19

"Adams v. State, 815 So. 2d 583, 585 (Ala. Crim. App. 2001).
Because life imprisonment without the possibility of parole
remains a sentencing option for juvenile offenders, even in
light of the Supreme Court's decisions in Miller and
Montgomery, the standard of review to be applied is an abuse-
of-discretion standard. ... [W]e see no reason to create or
apply a more stringent standard for reviewing a sentencing
court's ultimate determination following a hearing conducted
pursuant to Miller and Montgomery. Cf. [People v.] Skinner,
502 Mich. [89,] 137, 917 N.W.2d [292,] 317 [(2018)] ('Miller's
and Montgomery's emphasis on the rarity of juveniles
deserving of life-without-parole sentences does not counsel
against applying an abuse-of-discretion standard. The trial
court remains in the best position to determine whether each
particular defendant is deserving of life without parole. All
crimes have a maximum possible penalty, and when trial
judges have discretion to impose a sentence, the imposition of
the maximum possible penalty for any crime is presumably
"uncommon" or "rare." Yet this Court has never imposed a
heightened standard of appellate review, and it should not do
so in this instance.')."

Wilkerson v. State, 284 So. 3d 937, 956 (Ala. Crim. App. 2018). With this

in mind, we turn to Bracewell's arguments in this appeal.

Discussion

I.

First, Bracewell argues that the circuit court's order sentencing her

to life imprisonment without the possibility of parole "failed to comply

with this Court's previous order in this case." (Bracewell's brief, p. 22.)

According to Bracewell, this Court's opinion in Bracewell II "identified

two reasons why the circuit court's prior sentencing determination comprised an abuse of discretion": (1) "the court 'treat[ed] Bracewell's age as a fact in aggravation supporting a sentence of life imprisonment without the possibility of parole,'" and (2) "the lower court 'failed to adequately consider the hallmark features of youth' as set forth in Miller." (Bracewell's brief, p. 23.) Bracewell claims that the circuit court "incorporated neither of these two corrections into its resentencing analysis" and, she complains, that the "'new' sentencing order ... is largely the same as the prior order and, more importantly, provides no indication that the lower court replaced its previous, invalid analysis with a different, valid rationale for sentencing [her] to the 'harshest possible penalty.'" (Bracewell's brief, pp. 24-25.) Therefore, Bracewell concludes,

> "this Court should direct the circuit court that, in the absence of some basis that would overcome the extensive mitigating evidence regarding [her] immaturity, intellectual disability, horrific background, and substantial capacity for rehabilitation, it must sentence [her] to life with the possibility of parole."

(Bracewell's brief, p. 29.) Bracewell's argument is without merit.

In Bracewell II, this Court reversed the circuit court's judgment sentencing Bracewell to life imprisonment without the possibility of

21

parole because the circuit court had improperly used "Bracewell's age as a fact in aggravation" and, thus, had also failed "to properly consider the hallmark features of youth." Bracewell II, 329 So. 3d at 46. In reversing the circuit court's judgment, this Court instructed the circuit court to set aside its judgment sentencing Bracewell to life imprisonment without the possibility of parole "and to reconsider the Ex parte Henderson factors and resentence Bracewell in light of this opinion" -- i.e., without viewing Bracewell's age as a "fact in aggravation." Importantly, this Court neither directed the circuit court to reach a particular result in its reconsideration of the Ex parte Henderson factors, nor did it give the circuit court any guidance as to how to reconsider those factors (apart from the instruction that it could not use Bracewell's age as a fact in aggravation).[1]

_____

[1]Notably, Bracewell II is a per curiam opinion that received only one concurring vote from Judge Cole. Judges Kellum and Minor concurred in the result for different reasons. Judge Kellum explained that she did not believe this Court had to reach the question whether the court erred in considering Bracewell's age as a fact in aggravation and failed to consider hallmark features of youth, because Bracewell's sentence violates the Eighth Amendment under Miller, and that she would direct the circuit court to sentence Bracewell to life imprisonment. Judge Minor, on the other hand, agreed that the circuit court erred in considering Bracewell's age as a fact against her being sentenced to life

Here, the circuit court complied with this Court's instructions in Bracewell II when it reexamined the Ex parte Henderson factors in deciding Bracewell's sentence. And, in so doing, the circuit court did not weigh Bracewell's age as a fact in aggravation. Rather, the circuit court considered Bracewell's age at the time of the offense as a mitigating factor. (C. 83.) As this Court explained in Bracewell II, although "a juvenile's age is, under Miller, a fact in mitigation," nothing requires the circuit court to "afford a juvenile's age a certain weight, because what weight to afford mitigating evidence is generally within the trial court's discretion. See, e.g., Thrasher v. State, 295 So. 3d 118, 130-31 (Ala. Crim.

---

imprisonment, but he noted that it would be inappropriate for this Court to be the first to decide the appropriateness of Bracewell's sentence until her age at the time of the offense is properly considered by the circuit court. Judge McCool dissented with an opinion, which Presiding Judge Windom joined, explaining that the circuit court did not abuse its discretion when it sentenced Bracewell to life imprisonment without the possibility of parole.

In other words, a majority of this Court agreed on only one aspect of the main opinion: that the circuit court had improperly used Bracewell's age at the time of the offense as a fact against her when determining her sentence under Ex parte Henderson. Any other conclusion that Bracewell tries to draw from this Court's opinion in Bracewell II beyond that one aspect misinterprets this Court's holding in Bracewell II.

23

App. 2019), and Wilkerson v. State, 284 So. 3d 937, 959 (Ala. Crim. App. 2018)." 329 So. 3d at 45-46.

What is more, by not considering Bracewell's age as a fact in aggravation of her sentence and by evaluating the other Ex parte Henderson factors, the circuit court considered "the hallmark features of youth" as this Court instructed it to do. Indeed, the circuit court in its resentencing order, after examining each of the Ex parte Henderson factors, concluded:

> "Having carefully considered the relative hallmark features of youth, as well as the Henderson sentencing factors for juvenile capital murder defendants, it is hereby ORDERED, ADJUDGED, and DECREED that a jury, having found [Bracewell] guilty of the capital offense charged in the indictment, the Court sentences the [Bracewell] to life in prison without the possibility of parole."

(C. 90 (emphasis added).)

Although Bracewell acknowledges in her brief on appeal that the circuit court removed from its sentencing order references to the language that this Court found to be erroneous in Bracewell II, Bracewell maintains that the circuit court's correction of its erroneous analysis in this case still requires reversal because

> "the revised sentencing order provides this Court with no evidence that the lower court conducted a new,

24

constitutionally-valid sentencing analysis on remand. Simply deleting any explicit reference to a sentencing order's impermissible underlying justification, without changing the rest of the order's discussion of the balance of the evidence, does not eliminate the infirmity at issue. Given the complete record in this case, this Court has no reason to believe that the circuit court did not, in fact, rely on [Bracewell's] age as a counterbalance to the overwhelming mitigation."

(Bracewell's brief, p. 26.)

In other words, Bracewell asks this Court to presume that the circuit court, by removing the offending language from its sentencing order and by not changing other aspects of the order, did not really engage in a proper sentencing analysis under Ex parte Henderson. But Bracewell's position goes against our well settled principle that "'[w]e presume that trial court judges know and follow the law.'" Blackmon v. State, 7 So. 3d 397, 431 (Ala. Crim. App. 2005) (quoting Ex parte Atchley, 936 So. 2d 513, 516 (Ala. 2006)). To put it another way, unless the record on appeal affirmatively shows that the circuit court acted incorrectly, we presume that it acted correctly.

As Bracewell concedes, the circuit court's new order sentencing Bracewell to life imprisonment without the possibility of parole removes the offending language that affirmatively indicated that the circuit court had used Bracewell's age as an aggravating factor. Thus, the circuit

25

court's order does not affirmatively show that the circuit court failed to conduct a constitutionally valid sentencing analysis under Ex parte Henderson.[2] Bracewell's argument does not entitle her to any relief.

## II.

Next, Bracewell argues that her sentence of life imprisonment without the possibility of parole is "unconstitutionally disproportionate in this case given the mitigating evidence before the court" and that the "overwhelming mitigating evidence establishes that Debra Bracewell is not one of those 'rare offenders' for whom life without parole is proportionate."  (Bracewell's brief, p. 30.)  Bracewell raises two specific

---

[2]Bracewell also complains that the circuit court's order does not specify precisely how much weight the court assigned to the Ex parte Henderson factors.  But there is no constitutional requirement that the circuit court assign the Ex parte Henderson factors a specific amount of weight or to detail in its sentencing order the weight it assigned to each factor.  Rather, all that is required is that the circuit court consider all the evidence Bracewell presented as mitigation in light of the Ex parte Henderson factors.  See Miller v. State, [Ms. CR-20-0654, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023) ("Although the circuit court considered all the evidence Miller offered as mitigating, the court did not have to assign that evidence the weight that Miller wanted.").  Here, as explained above, the circuit court considered Bracewell's mitigating evidence and the Ex parte Henderson factors when it sentenced her to life imprisonment without the possibility of parole.

arguments on appeal as to why her sentence of life imprisonment without the possibility of parole is allegedly disproportionate.

First, Bracewell claims that her sentence "is disproportionate ... given the evidence of [her] rehabilitation." (Bracewell's brief, p. 31.) Specifically, Bracewell points to her "institutional record," which, according to her, "showed her remarkable disciplinary history." (Bracewell's brief, p. 33.) Bracewell says that she has been recommended for "the lowest possible security level," has been awarded certificates for "her consistent involvement in educational, religious, and therapeutic programming," and has been "praised throughout for her consistent, agreeable, and high-quality work in a variety of prison occupations, including at the factory, laundry, and library." (Bracewell's brief, p. 33 (citations omitted).) Bracewell also points to Alicia Smallwood's testimony. Smallwood is the State Chaplain at Tutwiler Prison, where Bracewell has been incarcerated, and Smallwood testified that she has a "high opinion" of Bracewell and that she has "interacted with her on a daily basis" for about nine years. (Bracewell's brief, p. 33.)

But, in its new sentencing order, the circuit court considered Bracewell's potential for rehabilitation, finding as follows:

27

"Depending on the point of view, this is perhaps the most difficult factor to analyze. If the sentencer is to consider the [Bracewell's] potential for rehabilitation at the time of the offense, then we are attempting an analysis of someone's character approximately forty (40) years ago.[7]

"Another issue for the Court is the lack of any statutory or caselaw definition or explanation of the term 'potential for rehabilitation.' That being the case, the Court will proceed giving these words their ordinary and usual meaning.

"[Bracewell's] potential for rehabilitation viewed at or around the time of the offense is heavily impacted by a felony conviction she received on November 28, 1977, for Burglary II and Grand Larceny in case number 23-CC-1977-283.

"The evidence from her school records show the following: 'A sweet pupil'; 'Tries very hard ...' (Def. Ex. 3). It was also reported, among other traits, that she 'often': 'Gets along will with classmates'; '[Can] work without supervision'; 'Finishes work started'; '[Does] neat work -- is thorough'; '[Puts] away materials after use'; 'Accepts constructive criticism'; 'Follows instructions'; '[Gets] along well with classmates'; '[Makes] friends easily'; 'Appears to be happy'; 'Has sense of humor'; and 'Has good relations with teacher.' It was stated that she 'always' 'Controls motions.' A handwritten note states she had 'Lot of potential.' (Def. Ex. 4). At the trial, [Bracewell's] high school counselor testified 'she usually seemed very sincere.' (State Ex. 1, Page R-490) and she gave 'no problems at all' at school. (State Ex. 1, R-505). Her brother testified at the sentencing hearing she was 'no trouble' growing up.

"[Bracewell] submitted numerous documents reflecting good behavior while in prison. (Def. Exs. 10, 12, 13, 16, & 17). In 2008, she was accepted into the 'Faith/Character Based Residential Housing Unit' in Tutwiler Prison. (Def. Ex. 10.) In her 'Classification Summary' completed in 2016, it was

28

stated that she 'has displayed positive institutional behavior with no disciplinary infractions on record since 2009. Completion of self-help programs noted.' (Def. Ex. 12). She supplied over 20 certificates from self-help programs and seminars completed while in prison. (Def. Ex. 13). She also presented the Court with satisfactory annual 'progress review forms' from Tutwiler Prison from 1993 to 2004. (Def. Ex. 16). [Bracewell] also presented positive reports from 1993 and 2003 concerning her work assignments, and positive 'supervisor's/correctional officer's report(s)' from 1992. (Def. Ex. 17).

"In addition to the above, Chaplain Alisha C. Smallwood, from Tutwiler Prison, testified at the sentencing hearing. Among other things, Chaplain Smallwood stated that [Bracewell] was always positive and encouraging to others. She testified that [Bracewell] assisted her in religious services. She also talked about how [Bracewell] is always ministering to newcomers and mentors new inmates.

"[Bracewell's] potential for rehabilitation based on her incarceration is negatively impacted by her conviction in 1990 for Escape I. (Def. Ex. 14; Pre-Sentencing Report; State Ex. 7-8).

"In addition, the State provided a letter written in 1989 from Marie Carnley, the widow of Rex Carnley, to the then-Governor of Alabama. In the letter, Marie Carnley purportedly <u>confessed</u> to the murder of her husband, Rex Carnley. She also asked for clemency for [Bracewell]. (State Ex. 6). Through later witnesses and exhibits, the State proved that this letter was actually written not by Marie Carnley, <u>but by [Bracewell]</u>. She forged a letter to the Governor making it look like the widow was confessing to the crime so that she could get out of prison. The last line of the letter states: 'I kill [sic] my own Husband and [Bracewell] is innocent.' (State Ex. 6).

29

"_____

"[7]Insofar as this Court can tell, [Bracewell] has never taken responsibility for her actions. One of the [victim's] sons testified that he never recalled [Bracewell] apologizing to his family. See Jones v. State, [335 So. 3d 361] (Ala. Crim. App. 2021) (noting the defendant had not taken responsibility for the murder as it relates to potential for rehabilitation). On the other hand, the evidence suggests [Bracewell] did attempt to blame the victim's widow for the murder. See paragraph D(13)(h).'"

(C. 89-90 (paragraph numbering and some footnotes omitted).)

Second, Bracewell argues that her sentence is "further disproportionate given the totality of the mitigating evidence in this case." (Bracewell's brief, p. 38.) According to Bracewell, "the circuit court was presented with extensive mitigating evidence showing that [her] culpability at the time of the crime was powerfully reduced by her intellectually disability and the traumatic circumstances of her childhood." (Bracewell's brief, p. 38.) Specifically, Bracewell points to evidence that, she says, highlights her immaturity, her development, her intellectually disability, her "impaired ... interactions with law enforcement and defense counsel," and her emotional history and family circumstances. (Bracewell's brief, pp. 38-43.) The circuit court, as it did

with her potential for rehabilitation, considered Bracewell's evidence in light of all the Henderson factors.

After examining Bracewell's mitigating evidence and the Henderson factors, the circuit court concluded that the appropriate sentence in this case is life imprisonment without the possibility of parole. (C. 90.) This Court has explained that

> "the decision to sentence a juvenile to life imprisonment without the possibility of parole '"is ultimately a moral judgment."' Boyd v. State, 306 So. 3d 907, 915 (Ala. Crim. App. 2019) (quoting Wilkerson v. State, 284 So. 3d 937, 955 (Ala. Crim. App. 2018), citing People v. Skinner, 502 Mich. 89, 117 n. 11, 917 N.W.2d 292, 305 n.11 (2018)). In Jones [v. Mississippi, 593 U.S. 98, 141 S. Ct. 1307 (2021)], the United States Supreme Court emphasized that sentencing courts have wide discretion in assigning weight to the facts and circumstances of each case:
>
> > " 'It is true that one sentencer may weigh the defendant's youth differently than another sentencer or an appellate court would, given the mix of all the facts and circumstances in a specific case. Some sentencers may decide that a defendant's youth supports a sentence less than life without parole. Other sentencers presented with the same facts might decide that life without parole remains appropriate despite the defendant's youth. But the key point remains that, in a case involving a murderer under 18, a sentencer cannot avoid considering the defendant's youth if the sentencer has discretion to consider that mitigating factor.'

31

"Jones, 593 U.S. at 115, 141 S. Ct. at 1319-20. In footnote 7 at the end of that paragraph, the Court emphasized that a potential violation of the Eighth Amendment could arise when a sentencing court expressly refuses as a matter of law to consider evidence of mitigating circumstances:

"'This Court's death penalty cases recognize a potential Eighth Amendment claim if the sentencer expressly refuses as a matter of law to consider relevant mitigating circumstances. See Eddings v. Oklahoma, 455 U.S. 104, 114-115, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982). By analogy here, if a sentencer considering life without parole for a murderer who was under 18 expressly refuses as a matter of law to consider the defendant's youth (as opposed to, for example, deeming the defendant's youth to be outweighed by other factors or deeming the defendant's youth to be an insufficient reason to support a lesser sentence under the facts of the case), then the defendant might be able to raise an Eighth Amendment claim under the Court's precedents. In any event, we need not explore that possibility because the record here does not reflect that the sentencing judge refused as a matter of law to consider Jones's youth.'

"593 U.S. at 115 n.7, 141 S. Ct. at 1320 n.7 (second emphasis added)."

Miller v. State, [Ms. CR-20-0654, Aug. 18, 2023] ___ So. 3d ___, ___ (Ala. Crim. App. 2023).

Here, although Bracewell argues that she presented evidence of her potential for rehabilitation and that she presented "overwhelming" evidence that she should be sentenced to life imprisonment, she has not

shown that the circuit court abused its discretion in a making the "moral judgment" to sentence her to life imprisonment without the possibility of parole. The circuit court clearly considered Bracewell's mitigating evidence but concluded that the appropriate sentence in this case is life imprisonment without the possibility of parole. Thus, Bracewell's arguments are nothing more than her disagreeing with the circuit court's weighing of the evidence.

But Bracewell's

"'"mere disagreement with the circuit court's weighing of the evidence does not entitle [her] to relief."' Wynn v. State, 354 So. 3d 1007, 1030 (Ala. Crim. App. 2021) (quoting Boyd v. State, 306 So. 3d 907, 919 (Ala. Crim. App. 2019)).

"'It is well settled that,

"'"'[w]here a trial judge imposes a sentence within the statutory range, this Court will not disturb that sentence on appeal absent a showing of an abuse of the trial judge's discretion.' Alderman v. State, 615 So. 2d 640, 649 (Ala. Crim. App. 1992). 'The exception to this general rule is that "the appellate courts may review a sentence, which, although within the prescribed limitations, is so disproportionate to the offense charged that it constitutes a violation of a defendant's Eighth Amendment rights."' Brown [v. State, 611 So. 2d

33

1194,] 1197, n. 6 [(Ala. Crim. App. 1992)], quoting Ex parte Maddox, 502 So. 2d 786, 789 (Ala. 1986)."

"'Adams v. State, 815 So. 2d 583, 585 (Ala. Crim. App. 2001).'

"Wilkerson v. State, 284 So. 3d 937, 956 (Ala. Crim. App. 2018)."

Jones v. State, 355 So. 3d 361, 387 (Ala. Crim. App. 2021).

Although Bracewell argues that her sentence is disproportionate here, her sentence is within the range of punishment set out for juvenile capital offenders. Based on the evidence presented at her Miller resentencing hearing and the circuit court's weighing of the evidence and its consideration of the Ex parte Henderson factors, we cannot conclude that Bracewell's sentence of life imprisonment without the possibility of parole is so grossly disproportionate as to warrant her relief on this claim. Thus, Bracewell's argument does not entitle her to relief.

## III.

Bracewell next argues that "the circuit court made multiple clearly erroneous findings in its review of the Ex parte Henderson factors, thereby failing to consider how [her] young age and 'the wealth of characteristics and circumstances'" warrant a sentence of life

34

imprisonment with the possibility of parole. (Bracewell's brief, p. 45.) Bracewell argues that "the circuit court's revised sentencing order provides no insight into how the Ex parte Henderson factors did or did not contribute to the court's ultimate sentencing determination." (Bracewell's brief, p. 46.) She further argues that, although the circuit court

> "organizes the evidence presented in [her] case according to the court's conception of the Ex parte Henderson factors, providing a haphazard description of the evidence, if any, that it found relevant to each, the order does not provide any factual findings about the weight of the relevant evidence or the effects of that evidence on [her] culpability."

(Bracewell's brief, p. 46.) Bracewell then sets out evidence that, she says, shows that certain Ex parte Henderson factors should weigh in favor of a sentence of life imprisonment. But the "findings" that Bracewell seeks here are not a requirement. Nor does her disagreement with how the circuit court viewed the evidence presented at the Miller resentencing hearing warrant granting her relief in this case.

In Betton v. State, 292 So. 3d 398 (Ala. Crim. App. 2018) -- a case decided years before the Supreme Court of the United States decided Jones v. Mississippi, supra, this Court remanded Betton's case to the circuit court when the circuit court did not issue written findings of fact

35

regarding the factors it considered in sentencing Betton, a juvenile, to life imprisonment without the possibility of parole. This Court explained that

> "the record is unclear regarding whether the circuit court considered the sentencing factors outlined in Ex parte Henderson to determine whether Betton was 'irreparabl[y] corrupt[ed]' or whether his 'crime[] reflect[ed] transient immaturity.' Montgomery, 577 U.S. 195, 136 S. Ct. at 726, 735 (other citations and quotations omitted). The record is also unclear regarding which factors the circuit court found applied to determine the appropriate sentence or what facts the circuit court found supported those factors. See Ex parte Henderson, 144 So. 3d at 1284 (recognizing that 'some of the factors may not apply to a particular juvenile's case and that some of the factors may overlap'). The lack of findings of fact has hampered this Court's ability to review the proportionality of Betton's sentence. ... Consequently, this cause is remanded to the circuit court with instructions for it to consider the sentencing factors established in Ex parte Henderson and to issue specific, written findings concerning which factors it finds to apply, the facts supporting those factors, and the weight given to those factors. Cf. Gaddy v. State, 698 So .2d 1100, 1146 (Ala. Crim. App. 1995)."

Betton, 292 So. 3d at 406 (footnote omitted). But this Court noted that "written findings of fact may not be required in every instance in which a juvenile is sentenced to life in prison without the possibility of parole," and further noted that "[t]his Court can foresee instances in which the record contains sufficient indications of the factors and facts considered

36

by the trial court to enable proportionality review." Betton, 292 So. 3d at 406 n. 2.

In deciding Betton, however, this Court did not have the benefit of the guidance from the Supreme Court of the United States in its Jones v. Mississippi decision, in which the Supreme Court rejected the argument that specific findings of fact are required before imposing a sentence of life imprisonment without the possibility of parole on a juvenile who has been convicted of capital murder.

> "In holding that a sentencer need not make a factual finding, either explicitly or implicitly, that a juvenile is irreparably corrupt before imposing a sentence of life imprisonment without the possibility of parole, the Court in Jones [v. Mississippi] specifically rejected the argument that Miller and Montgomery deemed irreparable corruption an 'eligibility criterion' for such a sentence, such as the lack of intellectual disability is an eligibility criterion for a sentence of death. 593 U.S. at 106, 141 S. Ct. at 1315. In other words, a juvenile capital offender does not have to be found to be irreparably corrupt for a sentence of life imprisonment without the possibility of parole to comply with Miller and Montgomery. Rather, such a sentence complies with Miller and Montgomery, the Jones Court held, if it 'was not mandatory and the trial judge had discretion to impose a lesser punishment in light of [the juvenile's] youth.' Jones, 593 U.S. at 120, 141 S. Ct. at 1322."

Wynn v. State, 354 So. 3d 1007, 1036-37 (Ala. Crim. App. 2021).

Recently, this Court addressed <u>Betton</u> and the fact-finding requirement for the <u>Ex parte Henderson</u> factors as follows:

"This Court remanded the cause in <u>Betton</u> for findings because the record was not adequate for this Court to review Betton's sentence under the <u>Henderson</u> guidelines.

"Also, when the Alabama Legislature amended the capital-murder statutes to address <u>Miller</u>, it did not direct, as it required for a death-penalty case, that a circuit court enter a written sentencing order stating its reasons for sentencing a juvenile convicted of capital murder to the harsher penalty of life imprisonment without parole.

"Furthermore, the United States Supreme Court in <u>Montgomery</u> acknowledged that <u>Miller</u> did not impose any 'formal factfinding requirement' on a sentencing judge. 577 U.S. at 211, 136 S. Ct. 718. See also <u>Garcia v. State</u>, 903 N.W.2d 503, 512 (N.D. 2017) ('<u>Miller</u> did not impose a formal factfinding requirement and the sentencer is not required to use the words "incorrigible" or "irreparable corruption." <u>Montgomery</u>, at 735. <u>Miller</u> "mandates only that a sentencer follow a certain process -- considering an offender's youth and attendant characteristics -- before imposing a particular penalty."')."

<u>Jones v. State</u>, 355 So. 3d 361, 384 (Ala. Crim. App. 2021).

In other words, although Bracewell complains about the circuit court's lack of fact-finding in its order sentencing her to life imprisonment without the possibility of parole, there is no formal "fact-finding" requirement when a circuit court sentences a juvenile who has been convicted of capital murder. Rather, all that is required is that there be

a process in place for the sentencing court to consider certain characteristics of youth before imposing a punishment on a juvenile defendant who has been convicted of capital murder. In Alabama, Ex parte Henderson provides the sentencing court with the list of youthful characteristics it should consider when imposing a sentence, but sentencing courts are not required to specify the weight given to specific Ex parte Henderson factors.

Here, Bracewell's Miller resentencing hearing followed the process put in place by the Alabama Supreme Court and the Alabama Legislature. And, as explained above, the circuit court's order shows that it followed that process when it imposed Bracewell's sentence. To be sure, this Court has held that sentences that are imposed within the process set out in Miller and Montgomery may nonetheless "violate the Eighth Amendment, which 'proscribes grossly disproportionate sentences.' Solem v. Helm, 463 U.S. 277, 288, 103 S. Ct. 3001, 77 L. Ed. 2d 637 (1983)." Wynn, 354 So. 3d at 1037. But in conducting a proportionality review of a juvenile life-imprisonment-without-parole sentence, this Court has explained that,

> "by holding that a sentencer did not have to find that a
> juvenile capital offender was irreparably corrupt before

39

CR-21-0242

imposing a sentence of life imprisonment without the possibility of parole, the Court made it clear that irreparable corruption is not the determining factor of the constitutionality of a sentence. Jones [v. Mississippi], 593 U.S. at 119, 141 S. Ct. at 1322. Rather, as with any proportionality challenge to a sentence, a court faced with a proportionality challenge to a sentence of life imprisonment without the possibility of parole imposed on a juvenile capital offender must consider 'all the circumstances of the case to determine whether the sentence is unconstitutionally excessive,' Graham v. Florida, 560 U.S. 48, 59, 130 S. Ct. 2011, 176 L. Ed. 2d 825 (2010), because '[n]o single criterion can identify when a sentence is so grossly disproportionate that it violates the Eighth Amendment.' Solem, 463 U.S. at 290 n.17, 103 S. Ct. 3001."

Wynn, 354 So. 3d at 1037. In sum, "the decision to sentence a juvenile to life imprisonment without the possibility of parole '"is ultimately a moral judgment"'" that rests with the "wide discretion" of the sentencing court. Miller, ___ So. 3d at ___ (quoting Boyd v. State, 306 So. 3d 907, 915 (Ala. Crim. App. 2019), quoting in turn Wilkerson v. State, 284 So. 3d 937, 955 (Ala. Crim. App. 2018), citing in turn People v. Skinner, 502 Mich. 89, 117 n. 11, 917 N.W.2d 292, 305 n.11 (2018)).

Here, we cannot say that Bracewell's sentence of life imprisonment without the possibility of parole is a "grossly disproportionate" sentence. Indeed, the circuit court carefully examined each of the Ex parte Henderson factors and made a judgment that a sentence of life

imprisonment without the possibility of parole was appropriate in this case. The circuit court clearly considered factors of Bracewell's youth and factors that showed Bracewell's culpability, including that she fired the fatal shot; that she acted intentionally; that she "ran off to Florida after taking several steps to cover up the murder"; that she "was involved in the planning to commit a crime"; that there was "very little" evidence indicating that her codefendant had any "actual influence over" her;[3] that she was not "limited in any way in assisting her attorneys either at trial or at during sentencing"; that there was no evidence indicating that she was suffering from a mental illness at the time of the offense; and that, although she had showed good behavior while incarcerated, Bracewell had also attempted to escape from prison and had forged a letter claiming to be Carnley's widow, confessing to the crime, and claiming Bracewell was not involved. (C. 76-90.) Based on the record in this case, this Court cannot say that Bracewell's sentence is disproportionate or that the

---

[3]The circuit court found that, although it was Charles Bracewell's idea to "rob Rex Carnley" and to have Bracewell "hold the gun on the victim," "the decision to pull the trigger appears to have been hers." (C. 88.)

41

circuit court abused its considerable discretion when it sentenced her to life imprisonment without the possibility of parole.

Accordingly, Bracewell is not entitled to any relief on this claim.

IV.

Bracewell, citing Miller v. Alabama, 567 U.S. 460, 473 (2012), Smith v. Texas, 543 U.S. 37, 45 (2004), Tennard v. Dretke, 542 U.S. 274, 287 (2004), and Lockett v. Ohio, 438 U.S. 586, 605 (1978), argues that the circuit court erred by "requiring a causal nexus between mitigating evidence and the offense before giving consideration to that evidence as mitigating." (Bracewell's brief, p. 52.) Specifically, Bracewell claims that, at her

> "resentencing proceedings, ... the circuit court imposed a requirement that the evidence in her case have a causal connection to the offense in order to support a sentence of life with the possibility of parole. After considering substantial evidence relating to [her] diminished culpability -- including evidence of her intellectual disability and its impact on 'her decision-making, impulse control, and ability to plan at the time of the offense' (2 C. 85-86) -- the circuit court ostensibly failed to weigh that evidence in favor of a lesser sentence because the defense failed to 'relate [this evidence] to her involvement in the crime in any meaningful way' (2 C. 86). This violated clear Supreme Court precedent."

(Bracewell's brief, p. 53.) The State, on the other hand, argues that, although Bracewell claims that the circuit court required a causal nexus

42

between her diminished culpability and the crime, nothing in the court's sentencing order shows that the circuit court "required a causal nexus or that it would not consider these factors as mitigating." (State's brief, p. 36.) Instead, the State argues the circuit court expressly considered the "relative hallmark features of Bracewell's youth" and that "Bracewell simply disagrees with the trial court's sentence, and[,] therefore, she impugns the trial court's analysis by drawing conclusions for which there is no basis." (State's brief pp. 36-37.) We agree with the State.

Recently, in Miller v. State, [Ms. CR-20-0654, Aug. 18, 2023] ___ So. 3d at ____ (Ala. Crim. App. 2023), this Court addressed Evan Miller's argument that "the circuit 'court imposed a requirement that [Miller's] youth and other mitigating circumstances have a causal connection to the offense in order to support a sentence of life with parole.'" This Court rejected Miller's argument, holding:

> "The cases Miller cites in support of his argument in this section -- decisions such as Tennard v. Dretke, 542 U.S. 274, 124 S. Ct. 2562, 159 L. Ed. 2d 384 (2004), and Smith v. Texas, 543 U.S. 37, 125 S. Ct. 400, 160 L. Ed. 2d 303 (2004) -- do not apply because in those cases, the trial courts refused to consider the evidence offered in mitigation. Cf. Woolf v. State, 220 So. 3d 338, 390-92 (Ala. Crim. App. 2014) (recognizing, in a capital case, that while a circuit court must consider all evidence the defendant offers as mitigating, the court need not find that evidence mitigating or assign to that evidence

43

the weight the defendant thinks it should).  Miller has not shown that the circuit court refused to consider -- for any reason -- any of the mitigating evidence he offered.  The court considered Miller's age to be a mitigating circumstance.  (C. 268.)  The court also considered Dr. Davis's testimony summarizing scientific articles about juvenile brains and 'diminished culpability.'  (C. 269.)  The circuit court found mitigating several factors such as Miller's exposure to violence as a child, his use of drugs, and his mental-health history.  (C. 269.)

"Although the circuit court considered all the evidence Miller offered as mitigating, the court did not have to assign that evidence the weight that Miller wanted.  Jones [v. Mississippi], 593 U.S. at 115 n.7, 141 S. Ct. at 1320 n.7; Boyd, 306 So. 3d at 929.  The portions of the order that Miller cites above show that the circuit court assigned less weight to certain evidence Miller offered.  Indeed, the circuit court assigned less weight to factors such as Miller's youth based on the court's finding that Miller was the 'principal aggressor.'  (C. 272.)  The court also noted that the crime was not impulsive or the product of youthful impetuosity, and the court found particularly damning Miller's statements to [the victim], 'I am God. I've come to take your life.'  (C. 272-73.)"

Miller v. State, ___ So. 3d. at ____.

Here, Bracewell takes issue with the portion of the circuit court's order addressing the second Ex parte Henderson factor -- i.e., the juvenile's diminished culpability -- in which the circuit court recounted testimony from Dr. Goff and found as follows:

"In addition to the conclusions drawn in his report, Dr. Goff testified that [Bracewell's] intellectual disability could

44

have affected her decision-making, impulse control, and ability to plan at the time of the offense.

"A 1986 evaluation by the Department of Corrections indicates, among other things, that [Bracewell's] 'mental deficiency' was 'Borderline.' (State Ex. 9). Dr. Goff testified that he would classify her intellectual disability as 'mild.'

"The Court finds that the totality of the opinions provided by Dr. Goff suggest [Bracewell] struggled with academics and related matters. However, his suggestion that her condition affected her decision-making at the time of the crime is generalized and not dispositive. Stated another way, Dr. Goff failed to tie these ideas about diminished culpability and intellectual disability to [Bracewell] and relate them to her involvement in the crime in any meaningful way."

(C. 85-86.) The circuit court also noted that Dr. Goff's testimony was "somewhat affected by the fact that he only spent 2 hours evaluating" Bracewell. (C. 86.)

Although the circuit court did not appear to place great weight on Dr. Goff's testimony about "diminished culpability" because he was not able to show whether Bracewell's condition actually affected her at the time of the offense, the circuit court's findings do not show that it required a "causal nexus" between the second Ex parte Henderson factor and the crime; rather, it showed that the circuit court carefully considered this "diminished-culpability" factor and was concerned with whether Bracewell had actually established the second Ex parte

Henderson factor. Simply put, Bracewell, just like Miller, supra, has not shown that the circuit court refused to consider the second Ex parte Henderson factor as a mitigating factor when it sentenced Bracewell to life imprisonment without the possibility of parole.

Accordingly, Bracewell is due no relief on this claim.

V.

Bracewell next argues that, because the State conceded that she "is not the rare offender deserving of the harshest possible punishment, life without parole cannot be imposed in this case." (Bracewell's brief, p. 55.) Bracewell's argument is without merit.

Section 13A-5-43(e), Ala. Code 1975, provides, in part, that a person who is under 18 years old at the time of the commission of a capital offense must be sentenced to either life imprisonment without the possibility of parole or to life imprisonment, and it provides that the appropriate sentence "shall be determined by the procedures set forth in the Alabama Rules of Criminal Procedure for judicially imposing sentences within the range set by statute without a jury, rather than as provided in Sections 13A-5-45 to 13A-5-53, inclusive. The judge shall consider all relevant mitigating circumstances."

Rule 14.3(a), Ala. R. Crim. P., provides that the "prosecutor and the defendant or defendant's attorney may engage in discussions with a view toward reaching an agreement that … the prosecutor … will recommend (or will not oppose) the imposition … of a particular sentence." And although these negotiations are permitted, Rule 14.3(c), Ala. R. Crim. P., is clear that the circuit court may reject any such agreement. What is more, Rule 26.6(a), Ala. R. Crim. P., makes clear that it is the judge who "shall impose the sentence in all cases."

In the juvenile capital-sentencing context, unless a sentencing agreement is reached by the parties and that agreement is accepted by the circuit court, it is the judge alone who is charged with considering the evidence presented at the <u>Miller</u> hearing in light of the <u>Ex parte Henderson</u> factors and to arrive at the "moral judgment" of what is the appropriate sentence in a given case. So, although a prosecutor's (or defense counsel's) opinion as to the strength or weaknesses of the evidence and the <u>Ex parte Henderson</u> factors is something that might persuade a circuit court to view the evidence at a <u>Miller</u> sentencing hearing in a certain way, the prosecutor's (or defense counsel's) opinions as to whether a person is (or is not) one of the "rare" juvenile offenders

47

who deserves life imprisonment without the possibility of parole has little bearing on whether the circuit court's judgment in a particular case is correct.

Here, the record is clear that there was no agreement reached by the parties as to Bracewell's sentence in this case. Rather, the prosecutor merely expressed an opinion as to his personal belief about whether Bracewell is one of the "rare" offenders who should be sentenced to life imprisonment without the possibility of parole.

Indeed, at a hearing on September 15, 2017, before her Miller resentencing hearing, the State told the circuit court that it "is not going to be opposing life in this case." (Record in CR-17-0014, R. 338.) The court then asked the State whether that meant that the parties had entered into "a plea agreement," and the State responded that "[t]here is no agreement." (Record in CR-17-0014, R. 338.) The court then told the parties that, if "you don't have an agreement, then we have to go forward." (Record in CR-17-0014, R. 339.) Bracewell then explained to the court:

> "[I]t would be the defense's position that if the State would file what they have stated here today, that the State does not oppose[ ] the giving of life with the possibility of parole sentence, then it would be the defense's position that a

48

hearing would not be at that point needed because it is -- pursuant to what is laid out in <u>Montgomery</u> that it would not be necessary, and that is following the United States Supreme Court as they laid out in that case."

(Record in CR-17-0014, R. 339-40.)  The court responded:

"That is not what I think is happening here.  What I think is happening is just like any sentencing case.  The State takes certain positions.  They take positions on probation.

"They take different positions on different things and the only way that we don't have a hearing is if y'all come up -- if y'all have an agreement as to what the sentence will be.  Then, I will approve that like a plea agreement.

"But, otherwise, all that they are saying is that at some point during the hearing they are going to say out loud that they don't oppose life as a possible sentence.

"Is that right?"

(Record in CR-17-0014, R. 340.)  The State responded, "That is correct."

(Record in CR-17-0014, R. 341.)  Thereafter, Bracewell argued to the circuit court that, if the State "were to take the position as they have informed that they are not opposing, then we believe that there would be no need for further evidence to be presented."  (Record in CR-17-0014, R. 346.)  The circuit court continued:

"I don't believe that I am required to with this sort of innocuous position, doesn't do anything, in my opinion except alert me to what the proof is going to be and to tell me that

their argument is just argument.  They are not going to argue for the higher sentence.

"Do you agree, State?"

(Record in CR-17-0014, R. 349.) Then the following exchange occurred:

"[Prosecutor]: After looking at the evidence that we have, the facts of the case based on -- comparing them to the <u>Henderson</u> factors, the State's position is that this defendant does not reach the level of those rare juveniles who would get life without.

"The Court: So why don't you reach an agreement with the defense and then we can truncate all of this and be done with it.

"[Prosecutor]: That is not been approved by our office yet.

"The Court: Well, ask whoever has the approval to come down here and try it with you.

"....

"[Prosecutor]: I think the judge has the right to consider any sentence, even if there is a plea agreement.  So, even if I -- even if we came in and said, we want to do life, we will put it in writing, you still have the option to sentence her to life without.

"The Court: Sure.  Just like any plea agreement, I can reject it."

(Record in CR-17-0014, R. 350-51.)

Later in the hearing, the court explained to the parties that, until the State filed something stating its position that life imprisonment would be the appropriate sentence in this case, it viewed the prosecutor's statement "as simply argument." (Record in CR-17-0014, R. 357.) The prosecutor then told the circuit court that he would "take that back to [his] bosses and discuss it with them" and that "[m]aybe we can have an answer for you soon." (Record in CR-17-0014, R. 357.) To make sure that her witnesses would not be inconvenienced if the State was going to agree to a sentence of life imprisonment, Bracewell asked "that … they would be able to do that here in the next week." (Record in CR-17-0014, R. 360.) The prosecutor responded, "It would be by the end of this week if that happens." (Record in CR-17-0014, R. 360.)

On August 28, 2017, the State told the circuit court and Bracewell that its "position is that the Court, it is up to the Court to decide, obviously, this sentence, between life and life without. The State is not recommending life without parole and is not recommending life." (Record in CR-17-0014, R. 6.) In other words, the State explained that it was not taking a position on a sentence in Bracewell's case. The circuit court then asked the State if it "expect[s] to put on evidence that would support" the

51

Ex parte Henderson factors, and the State responded that it "will put on the facts of the case." (Record in CR-17-0014, R. 7-8.)

So, although Bracewell argues that she cannot be sentenced to life imprisonment without the possibility of parole because the State said that she "is not the rare offender deserving of the harshest possible punishment," (Bracewell's brief, p. 55), the prosecutor's opinion as to whether life imprisonment was the appropriate sentence in this case never materialized into an agreement between the parties, and, regardless of the prosecutor's opinion, Alabama law is clear that it is the circuit judge who is charged with the duty to exercise his or her "moral judgment" to impose the appropriate sentence when sentencing a juvenile who has been convicted of a capital offense. Thus, Bracewell's argument that the prosecutor's opinion expressed before the resentencing hearing precludes the circuit court from imposing a sentence of life imprisonment without the possibility of parole is without merit.

Accordingly, Bracewell is due no relief on this claim.

## VI.

Bracewell also argues that "sentencing an intellectually disabled child to life without the possibility of parole violates the Eighth

Amendment as well as State and Federal Law." (Bracewell's brief, p. 60.) Bracewell claims that because, in <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), the "Supreme Court ... established that individuals with intellectually disability have inherently diminished culpability," a juvenile who is intellectually disabled is "ineligible for a sentence of life without parole." (Bracewell's brief, pp. 61-62.) As the State correctly points out, "Bracewell's argument seeks to extend the holding ... in <u>Atkins</u>, that the execution of [intellectually disabled] criminals is cruel and unusual punishment under the Eighth Amendment, to mandate a prohibition against the imposition of a sentence of life without parole on a juvenile capital offender who is intellectually disabled." (State's brief, pp. 46-47.) But neither this Court, the Alabama Supreme Court, nor the Supreme Court of the United States has extended <u>Atkins</u> to bar a sentence of life imprisonment without the possibility of parole for an intellectually disabled a juvenile offender who has been convicted of a capital offense, and we decline to do so here.[4] Thus, Bracewell's argument does not entitle her to any relief.

_____

[4]Notably, although Bracewell characterizes herself as "intellectually disabled," the circuit court in this case never made such a

53

VII.

Bracewell next argues that "[s]entencing any juvenile to die in prison constitutes cruel and unusual punishment in violation of the United States and Alabama constitutions." (Bracewell's brief, p. 66.) Based on previous holdings of the Supreme Court of the United States, Bracewell's argument is without merit. Simply put,

> "'Miller did not foreclose a sentencer's ability to impose life without parole on a juvenile.' Montgomery v. Louisiana, 577 U.S. 190, 195, 136 S. Ct. 718, 193 L. Ed. 2d 599 (2016). See also Miller v. Alabama, 567 U.S. 460, 483, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012) ('Our decision does not categorically bar a penalty for a class of offenders or type of crime.'). Indeed, as the United States Supreme Court recently recognized: 'Under Miller v. Alabama, 567 U. S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012), an individual who commits a homicide when he or she is under 18 may be sentenced to life without parole, but only if the sentence is not mandatory and the sentencer therefore has discretion to impose a lesser punishment.' Jones v. Mississippi, 593 U.S. 98, 100, 141 S. Ct. 1307, 1311, 209 L. Ed. 2d 390 (2021)."

---

conclusion under the framework established in Atkins. The circuit court did, however, consider Bracewell's evidence of her diminished culpability, intellectual capacity, and mental-health history when it examined the Ex parte Henderson factors and sentenced her to life imprisonment without the possibility of parole. In short, the circuit court did not indicate that Bracewell's evidence of those factors weighed in favor of a sentence of life imprisonment.

Wynn, 354 So. 3d at 1017. In other words, a sentence of life imprisonment without the possibility of parole on a juvenile convicted of capital murder is a constitutionally permissible sentence when the sentencing court has discretion to impose a lesser sentence. Alabama's juvenile-capital-sentencing scheme complies with the Miller requirement. Thus, Bracewell is not entitled to any relief on this claim.

VIII.

Bracewell argues that the circuit court erred when it did not allow her to present evidence at the hearing in 2017 "raising questions as to [her] possible innocence." (Bracewell's brief, p. 71.) Bracewell's argument is without merit.

Although the circuit court must consider the 14 Ex parte Henderson factors when it determines what sentence to impose on a juvenile who has been convicted of a capital offense, none of those 14 factors concern residual doubt or, as Bracewell puts it, "questions as to [her] possible innocence." That is because

> "'residual doubt' is not a mitigating circumstance. '"'Residual doubt' is not a factor about the defendant or the circumstances of the crime. It is instead a lingering uncertainty about facts, a state of mind that exists somewhere between 'beyond a reasonable doubt' and 'absolute certainty.'"' Harris v. State, 632 So. 2d 503, 535 (Ala. Crim. App. 1992), quoting Franklin

55

> v. Lynaugh, 487 U.S. 164, 187-88, 108 S. Ct. 2320, 101 L. Ed. 2d 155 (1988)."

Sharifi v. State, 993 So. 2d 907, 950 (Ala. Crim. App. 2008). Contrary to Bracewell's argument on appeal, the circuit court properly precluded her from presenting evidence "as to her possible innocence" while, at the same time, allowing her to present evidence that concerned her role in the capital offense that overlapped with the Ex parte Henderson factors.

On February 7, 2017, Bracewell filed a "Motion to Submit Evidence and Argue Residual Doubt at the Penalty Phase." (Supp. Record in CR-17-0014, C. 245-48.) In her motion, Bracewell argued that her "defense strategy" centered on "her innocence and reasonable doubt as to her guilt." (Supp. Record in CR-17-0014, C. 245.) Bracewell further argued that evidence "casting doubt on [her] guilt is relevant mitigating evidence because that evidence concerns a 'circumstance of the offense.'" (Supp. Record in CR-17-0014, C. 246.) Bracewell asked the court to allow her "to submit evidence at the penalty phase casting doubt on her guilt and conviction, the circumstances surrounding [her] participation in the offense, and which lessens [her] level of culpability for the offense." (Supp. Record in CR-17-0014, C. 247.)

On February 14, 2017, the State responded to Bracewell's motion, arguing that residual doubt is not a mitigating factor for purposes of imposing a sentence on Bracewell. (Record in CR-17-0014, C. 74-78.)

Thereafter, the circuit court held a hearing addressing, among other things, Bracewell's "motion to submit evidence and argue residual doubt at the penalty phase." (Record in CR-17-0014, R. 319.) At that hearing the following exchange occurred:

> "[Bracewell's counsel]: Well, Judge, we supplied some cases that dealt with some things that would or may be considered residual doubt and we are of the opinion under those United States Supreme Court caselaw that, although there are some things that we may not be able to address, that there maybe some things that we could address in regards with what might also be determined to be residual doubt.
>
> "For example --
>
> "The Court: How about, let's start with is there an Alabama Supreme Court case or Court of Criminal Appeals case that says that the defense is allowed to argue residual doubt in the penalty phase?
>
> "[Bracewell's counsel]: I believe Alabama's case says that, there are some Alabama cases that deal with mitigating circumstances and I have addressed that in our motion.
>
> "It is ex parte. And it talks about that Alabama law explicitly provides, you know, the evidence presented at trial in the case may be considered in so far as it is relevant to the, of course, there are aggravating and mitigating circumstances

without the necessity of reintroducing that evidence at the sentencing hearing.

"And then, the other United States Supreme Court cases that we are referencing in our motion speak of and specifically addresses, for example, the case of Green v. Georgia from the United States Supreme Court. In that case, there was exclusion of evidence at the penalty phase of a capital trial that the codefendant killed the victim after sending the defendant on and held that unconstitutional.

"So, we would argue that if we were to present, for example, evidence of, as mitigation or a non-shooter type of evidence, then that would be evidence that the State might consider to be residual evidence, but at the same time pursuant to the United States Supreme Court, that certainly would be, you know, mitigation or one of pieces of evidence that we would be able to provide under Miller.

"The Court: I agree with that. I agree that you can say that, in sentencing you can say this person did not physically commit the crime. You can say that or you can prove that they did not pull the trigger, for lack of a better way to say that but -- and you can say they were under the -- you can argue and put on evidence that they might have been under the influence of another, of a codefendant.

"That seems like to me kind of ordinary, run of the mill evidence, and, when you have multiple defendants. But, I mean, let me hear what the State has to say.

"[Prosecutor]: I would just say, first of all there is a case Ex parte Louis which I cited in my motion, that says that it is inarguable that residual doubt is not a factor about the defendant's character or record or any of these circumstances of the offense and that residual doubt is not a mitigating circumstance when it comes to sentencing.

"And I will also point to the facts in this case. If it comes down to a, a case where you are not sure who shot or who did it, the facts in this case that a jury found to be true in order to find this defendant guilty of capital murder, were that she did, she did point a gun at Mr. Carnley's head and pull the trigger and shoot him in the back of the head.

"So, they can't argue that didn't happen at this point, because a jury found that it did happen. Now, whether she was under the influence or not, they can go from the evidence at the trial, which was presented at the trial, and if they want to bring in, if they have evidence somehow of that, but they can't come in and say that she didn't do this.

"The Court: I agree 100%, I am, I agree with you. So, I am denying that motion. You can't argue that she didn't do it. You can argue, I think, that there is a place where this is going to get a little bit tedious, where there is an overlap between mitigation evidence and the facts of the case. Because the facts that led to a person being convicted of a crime can include things that would be considered mitigation in the sentencing phase of the trial.

"But, I am denying the motion. And, you know, but I don't know what I will do in the middle of a trial when somebody starts to put on some kind of evidence. I mean, you will have to object or you will have to, we will have to deal with it in a motion in limine.

"But, this defendant has been, actually convicted twice. And we are not going to have a new trial about her culpability -- not culpability is the wrong word. But we are not going to have another trial about whether she is guilty or not."

(Record in CR-17-0014, R. 319-24.) The circuit court memorialized its

decision in a written order denying Bracewell's motion, but explaining

59

that its "ruling in no way restricts the admissibility of evidence in 'mitigation' and, to the extent that there is some disagreement about the character and nature of this type of evidence, the Court will take that up when the evidence is offered to the Court for admission." (Record in CR-17-0014, C. 128.)

In sum, the circuit court did not allow Bracewell to present "residual doubt" evidence, but it allowed her to present evidence concerning the Ex parte Henderson factors that touch on her role and participation in the capital offense. The circuit court's judgment is in conformity with decisions from this Court and the Alabama Supreme Court holding that residual doubt is not a mitigating factor to consider for purposes of sentencing. Accordingly, Bracewell is not entitled to any relief on this claim.

IX.

Finally, Bracewell argues that the circuit court erred at her 2017 resentencing hearing when it allowed the State to present evidence of a letter that it said Bracewell wrote in 1989 to then Governor Guy Hunt purporting to be Rex Carnley's wife and claiming that Carnley's wife actually killed Carnley. According to Bracewell,

"[t]he only evidence provided by the State to support this speculation, however, was testimony from Marie Miller ('Mrs. Carnley') that she had not written the letter (R. 78), as well as a passing affirmation from [Bracewell's] brother that the handwriting in the letter 'sort of look[ed] like' [Bracewell's] (R. 116). [Bracewell's] cousin, however, who had also exchanged letters with [Bracewell], later testified that she did not recognize the handwriting.[5]  (R. 222-23.)"

(Bracewell's brief, p. 74.)  Bracewell contends that the circuit court erred when it admitted the fabricated letter because "there was no foundation for the State's speculation that [Bracewell] had written the 1989 letter, and as a result there was no basis on which to find it relevant." (Bracewell's brief, p. 75.)  Bracewell says, the State "presented no evidence whatsoever to establish that [the letter] was written by [Bracewell] ... -- beyond her brother's passing affirmation on cross[-examination]."  (Bracewell's brief, p. 75.)  Bracewell's argument is not preserved for appellate review.

We have explained:

---

[5]Bracewell's characterization of Nancy Daniel's testimony is misleading.  In making her argument, Bracewell implies that Daniel did not recognize the <u>forged</u> letter to be written in Bracewell's handwriting. But that is not what Daniel said.  Rather, in the State's cross-examination of her, the State showed Daniel a <u>known</u> sample of Bracewell's handwriting -- not the forged letter -- and asked her if she recognized the handwriting; she said that she did not.  (Record in CR-17-0014, R. 223.)

> "'"[I]n order for this court to review an alleged erroneous admission of evidence, a timely objection must be made to the introduction of the evidence, specific grounds for the objection should be stated and a ruling on the objection must be made by the trial court." Goodson v. State, 540 So. 2d 789, 791 (Ala. Crim. App. 1988). "When a timely objection at the time of the admission of the evidence is not made, the issue is not preserved for this Court's review." Ziglar v. State, 629 So. 2d 43, 47 (Ala. Crim. App. 1993).'
>
> "Chaney v. State, 892 So. 2d 466, 468 (Ala. Crim. App. 2004). See also Slaughter v. State, 411 So. 2d 819 (Ala. Crim. App. 1981) (holding that, because the appellant 'did not object or move to exclude the specific evidence, there is no error preserved for our review.')."

Hubbard v. State, 324 So. 3d 855, 866 (Ala. Crim. App. 2019).

Here, during Bracewell's Miller resentencing hearing, the State offered as evidence the complained-of State's Exhibit 6 -- a letter dated May 8, 1989, to then Governor Guy Hunt purportedly signed by "Mrs. Carnley," in which "Mrs. Carnley" says that Bracewell "is innocent" because "Charles Bracewell help me kill my own husband." (Record in CR-17-0014, C. 1234-36, R. 72.)

At the time the State offered the letter, Bracewell objected to its admission, arguing that "[t]here has not been a proper foundation of authentication in regards with that letter." (Record in CR-17-0014, R.

72.) The State responded that, "under [Rule] 26.6[, Ala. R. Crim. P.], as long as you deem it probative, it is admissible." (Record in CR-17-0014, R. 73.) Thereafter the following exchange occurred:

"The Court: I am going to sustain until I have had a chance to look at it and look at the rule. So, I am not saying no. Let me have it. I just want to take a look at it.

"[Bracewell's counsel]: We would add that under the relevant caselaw that evidence at a sentencing hearing [is] relevant if it logically relates to the ultimate material inference in the case for which it is preferred or which is proper. So, we would state that it would not be that.

"The Court: Well, on a relevance point, I am going to overrule on that, because for this reason -- you know, in 1989, Mrs. Miller's [-- i.e., Carnley's wife --] emotions and memories of things might have been sharper than it would be today and so, you know, to me --

"[Prosecutor]: Judge, I will tell you where I am going with this. This was reported to be written by Mrs. Miller. The State does not believe that it was actually written by Mrs. Miller.

"The Court: Okay.

"[Prosecutor]: The State believes that it was written by "[Bracewell], posing as Mrs. Miller.

"The Court: All right. So my ruling is that it is under advisement. Anything else? I mean, if it is -- if it is in fact a forged letter then, relating to the case then I think that would be relevant.

63

"My question right now is whether or not given what sort of foundation has been laid for it, whether or not I can accept it.

"[Bracewell's counsel]: Our position would be that there is not a proper foundation that has been laid. There is no evidence testimony provided in regards with that letter.

"The Court: I understand and I am taking your objections under advisement, under submission."

(Record in CR-17-0014, R. 73-74.)

The State then called Marie Miller, Carnley's widow, to testify about State's Exhibit 6. (Record in CR-17-0014, R. 78.) Miller said that the handwriting in the letter is not hers, that she does not recognize the handwriting in that letter, and that she did not write a letter to Governor Guy Hunt in 1989. (Record in CR-17-0014, R. 78.) Bracewell did not cross-examine Miller. The circuit court kept State's Exhibit 6 "under submission." (Record in CR-17-0014, R. 78.) Then during Bracewell's presentation of evidence, the State cross-examined Bracewell's brother, Jimmy Fillman. The State asked Fillman whether he had been "in contact with [Bracewell] regularly," and Fillman said that they had exchanged letters and that he had seen her handwriting before. (Record in CR-17-0014, R. 116.) The State asked Fillman to look at State's Exhibit 6 to see if he recognized the handwriting; Fillman responded, "It

64

sort of looks like hers, yes." (Record in CR-17-0014, R. 116.) The State then moved to admit State's Exhibit 6, and the circuit court said: "Same ruling. It is under submission." (Record in CR-17-0014, R. 116.) Bracewell did not object or make any argument as to State's Exhibit 6. Then, after the close of the defense case, the circuit court told the parties: "For some housekeeping, State's Exhibit 6 is admitted. I had previously had it under submission. I am admitting it." (Record in CR-17-0014, R. 258.) Bracewell did not object or make any argument concerning the circuit court's admission of State's Exhibit 6.

So, although Bracewell initially objected to the admission of State's Exhibit 6 because, she said, the State had not established "a proper foundation of authentication in regards with that letter" (Record in CR-17-0014, R. 72), the State then put on additional evidence from Miller who said that she did not write State's Exhibit 6 and from Fillman who said that the handwriting in State's Exhibit 6 looked like Bracewell's handwriting. After the State presented this additional evidence showing that it was Bracewell -- not Miller -- who wrote the letter to Governor Hunt and after the State moved again to admit State's Exhibit 6, Bracewell did not object on the basis that the State had failed to establish

a foundation after it had presented the additional evidence from Miller and Fillman. Because Bracewell did not object to the admission of State's Exhibit 6 after the State presented this additional evidence, her argument on appeal that Miller's testimony and Fillman's testimony did not establish a proper foundation for the admission of State's Exhibit 6 is not properly before this Court for appellate review.

In any event, the circuit court properly admitted State's Exhibit 6. The Alabama Rules of Evidence do not apply at sentencing hearings, including a juvenile capital-sentencing hearing. See Rule 1101(b)(3), Ala. R. Evid. (providing that the rules of evidence do not apply to sentencing hearings). Instead, the admissibility of evidence at a juvenile capital sentencing hearing is governed by the Alabama Rules of Criminal Procedure. See § 13A-5-43(e), Ala. Code 1975 (explaining that the sentence imposed during a juvenile capital-sentencing hearing "shall be determined by the procedures set forth in the Alabama Rules of Criminal Procedure for judicially imposing sentences within the range set by statute without a jury, rather than as provided in Sections 13A-5-45 to 13A-5-53, inclusive"). Rule 26.6(b)(2), Ala. R. Crim. P., provides that, at a sentencing hearing,

"[d]isputed facts shall be determined by the preponderance of evidence. Evidence may be presented by both the state and the defendant as to any matter that the court deems probative on the issue of sentence. Such matters may include, but are not limited to, the nature and circumstances of the offense, the defendant's character, background, mental and physical condition, and history, the gain derived by the defendant or the loss suffered by the victim as a result of defendant's commission of the offense, and any other facts in aggravation or in mitigation of the penalty. Any evidence that the court deems to have probative value may be received, regardless of its admissibility under the rules of evidence."

(Emphasis added). In short, although the Alabama Rules of Evidence do not apply to a Miller resentencing hearing, the State and the defendant bear the burden of establishing that the evidence they present is "probative on the issue of sentence." The State met its burden here as to the letter it said Bracewell sent to then Governor Hunt claiming to be written by Rex Carnley's wife and "confessing" to killing her husband.

Indeed, as set out above, the State presented some evidence that State's Exhibit 6 was authored by Bracewell, not Miller. The question of whether Bracewell actually authored the letter to Governor Hunt is a question that goes to the weight of the evidence, not to its admissibility. What is more, State's Exhibit 6 is probative of, at least, the 13th Ex parte Henderson factor -- i.e., the juvenile's potential for rehabilitation. In the

67

portion of its sentencing order addressing the 13th <u>Ex parte Henderson</u> factor, the circuit court discussed State's Exhibit 6 as follows:

> "In addition, the State provided a letter written in 1989 from Marie Carnley, the widow of Rex Carnley, to the then-Governor of Alabama. In the letter, Marie Carnley purportedly <u>confessed</u> to the murder of her husband, Rex Carnley. She also asked for clemency for [Bracewell]. (State Ex. 6). Through later witnesses and exhibits, the State proved that this letter was actually written not by Marie Carnley, <u>but by [Bracewell]</u>. She forged a letter to the Governor making it look like the widow was confessing to the crime so that she could get out of prison. The last line of the letter states: 'I kill [sic] my own Husband and Debra is innocent.' (State Ex. 6)."

(C. 90.)

Because Bracewell's argument is not preserved for appellate review, and because, even if it had been, the circuit court did not err when it admitted State's Exhibit 6, Bracewell is not entitled to any relief on this claim.

### Conclusion

Based on these reasons, the judgment of the circuit court is affirmed.

AFFIRMED.

Windom, P.J., and McCool, J., concur. Minor, J., concurs in the result. Kellum, J., dissents, with opinion.

CR-21-0242

KELLUM, Judge, dissenting.

Debra Bracewell appeals her resentencing, pursuant to <u>Miller v. Alabama</u>, 567 U.S. 460 (2012), to life imprisonment with the possibility of parole, imposed for her conviction for a capital crime she committed when she was 17 years old. For the reasons stated in my special concurrence in <u>Bracewell v. State</u>, 329 So. 3d 29 (Ala. Crim. App. 2020) (opinion on return to remand), I believe Bracewell's sentence violates the Eighth Amendment to the United States Constitution under <u>Miller</u> and its progeny. Therefore, I respectfully dissent.